Central Artery (I-93)/Tunnel (I-90)
Project Labor Agreement

Agreement

This Project Labor Agreement (hereinafter, the "Agreement") is entered into this, **28th** day of **November**, 1989 by and between Bechtel/Parsons Brinckerhoff its successors or assigns, and the Building and Construction Trades Department, AFL-CIO (hereinafter, the "Department"), on behalf of its affiliated Local Unions, each acting in its own behalf and on behalf of its respective affiliates and members (hereinafter, collectively called the "Union" or "Unions"), with respect to the construction of the Central Artery (I-93)/Tunnel (I-90) Project as defined herein.

It is understood by the parties to this Agreement that it is the policy of the Massachusetts Department of Public Works (hereinafter, the MDPW) that the construction work covered by this Agreement shall be contracted to Contractors who agree to execute and be bound by the terms of this Agreement. Therefore, the Unions agree that other contractors may execute the Agreement for the purpose of covering that work. The Bechtel/Parsons Brinkerhoff shall monitor compliance with this Agreement by all Contractors who through their execution of this Agreement, together with their subcontractors, have become bound hereto.

The term "Contractor" shall include all Contractors and subcontractors of whatever tier engaged in on-site construction work within the scope of this Agreement. Where specific reference to Bechtel/Parsons Brinckerhoff alone is intended, the term "Bechtel/Parsons Brinckerhoff" is used.

The Union and the Bechtel/Parsons Brinckerhoff and all signatory Contractors agree to abide by the terms and conditions contained in this Agreement with respect to the administration of the Agreement by the Bechtel/Parsons Brinckerhoff. This Agreement represents the complete understanding of the parties, and it is further understood that no Contractor party is required to sign any other agreement as a condition of performing work within the scope of this Agreement. No practice, understanding or agreement between a contractor and a Union party which is not explicitly set forth in this Agreement shall be binding on any other party unless endorsed in writing by the Bechtel/Parsons Brinckerhoff.

ARTICLE I

The Central Artery (I-93)/Tunnel (I-90) Project, an undertaking of the Massachusetts Department of Public works, is one of the largest public works projects in the history of New England that will take approximately nine years to construct. It is the aim and goal of this Project to fulfill the following major objectives:

- o To widen and depress the Central Artery in order to increase capacity, reduce congestion and improve the flow of the traffic from the I-93/I-90 Interchange area to the Charles River; reduce traffic congestion and improve traffic flow on other streets and highways in the project area, including those that connect to the Central Artery and improve system safety.

- o To complete I-90 in Massachusetts and to provide increased cross-harbor capacity and access to Logan Airport by constructing a Third Harbor Tunnel.

- o To improve the flow of commercial traffic through South Boston by connecting the Southeast Expressway (I-93) to the proposed Seaport Access Road (I-90) via a new South Boston By-Pass Road.

The scheduled completion of this Project in a timely manner is of vital importance to the economic health of the City of Boston as well as all of the people of the Commonwealth of Massachusetts.

It is therefore essential that the construction work be performed in an efficient and economical manner in order to secure optimum productivity and to eliminate any cause for delay in the completion of the scheduled work. In recognition of the special needs of this Project and to maintain a spirit of harmony, labor-management peace, and stability during the term of this Agreement, the parties agree to establish effective and binding methods for the settlement of all misunderstandings, disputes or grievances which may arise. Therefore, the Unions agree not to engage in any strike, slowdown or interruption of work and the Contractor agrees not to engage in any lockout.

ARTICLE II

SCOPE OF THE AGREEMENT

Section 1. This Project Labor Agreement, hereinafter designated as the "Agreement," shall apply and is limited to all construction work under the direction of the signatory Contractors and performed by those Contractor(s) of whatever tier which have contracts awarded for such work on and after the effective date of this Agreement, which may include the Bechtel/Parsons Brinckerhoff, for the MDPW with regard to the Central Artery (I-93)/Tunnel (I-90) "Project".

Such Project is generally described as the construction planned and executed in the following areas:

SOUTH BAY/FT. POINT CHANNEL

(1) A major highway interchange with the Mass. Turnpike/Central Artery/Southeast Expressway and Seaport Access Tunnel which crosses Fort Point channel and the existing MBTA Redline.

(2) High occupancy vehicle lanes and ramps with access to the South Station Transportation center.

(3) All divergent roadways and ramps transitions to South Hampton Street Massachusetts Avenue, West 4th Street Bridge, surface roadways, Broadway Bridge, Herald Street Extension and Frontage Road.

(4) All related supported, underpinning and required track relocations and shifting necessary for the construction of the above mentioned highway bridges and tunnels passing through the South Station railroad track array.

(5) All ventilation facilities and structures.

CENTRAL AREA

(1) The depression, by means of cut and cover construction of the existing six lane Central Artery and the widening of that Artery to eight lanes, from the I-90/I-93 interchange to the vicinity of Causeway Street at North Station.

(2) The underpinning of the existing elevated Artery and the construction of all earth support structures including extensive use of concrete slurry walls.

(3) Support, protection and underpinning of all abutting facilities within the influence of the depressed artery construction.

(4) Modifications to the Dewey Square Tunnel section.

(5) All divergent on and off ramps and distributor roads.

(6) Construction of a parking garage and ventilation facilities near Haymarket.

(7) Final removal of the existing elevated expressway.

NORTH OF CAUSEWAY STREET

(1) Construction of a portal and transition to a viaduct structure.

(2) A new multi-lane bridge crossing over the Charles River.

(3) The rejoining of Interstate Route 93 and modifications to Leverett Circle and Storrow Drive.

(4) The tie-in to the CANA Project.

SOUTH BOSTON

(1) Construction of cut and cover tunnel sections, boat sections, portals and "on and off" ramps.

(2) A sunken tube tunnel that crosses under Boston Harbor passing under the shipping channel, surfacing at Bird Island Flats

(3) Ventilation facilities.

(4) Access ramps to and from the Seaport Access Tunnel

EAST BOSTON AREA

(1) "Cut and cover" and "boat section" tunnel to and from the airport roadway system

(2) Viaduct structures

(3) Changes to the airport roadway system improving access and access mobility.

(4) Ventilation facilities.

Also included is the proposed construction of a material disposal containment facility at Spectacle Island and its related loading/unloading, barging structures and barging to and from the island. In addition to the above, all project laydown areas are covered by this agreement.

Section 2(a). The MDPW, Bechtel/Parsons Brinckerhoff, and/or Contractor, as appropriate, has the absolute right to select any qualified bidder for the award of contracts on this Project without reference to the existence or nonexistence of any Agreements between such bidder and any party to this Agreement provided, however, only that such bidder is willing, ready and able to execute and comply with this Agreement, should it be designated the successful bidder.

(b) It is agreed that all direct subcontractors of a Contractor, of whatever tier, who have been awarded contracts for work covered by this Agreement on or after the effective date of this Agreement shall be required to accept and be bound by the terms and conditions of this Agreement.

Section 3(a). The provisions of this Agreement (including the attached Schedule A's which are the Local Building Collective Bargaining Agreements) covering Building work, and the attached schedule A's & B's which are the Local Collective Bargaining Agreements which have jurisdiction over Heavy & Highway work shall apply to the construction of the Project notwithstanding the provision of Local, Area, and/or National Agreements which may conflict or differ from the terms of this Agreement. Where a subject covered by the provisions of this Agreement is also covered by the Collective Bargaining Agreement which serves as the basis for the attached Schedules A and/or B, the provisions of this Agreement shall prevail. Where a subject is covered by the provisions of Schedules A and/or B and not covered by this Agreement, the Schedules A and/or B provisions shall prevail.

The parties to this agreement acknowledge that the Project consists of work that falls within the traditional jurisdiction of Heavy and Highway work and the traditional jurisdiction of building work and that the appropriate local collective bargaining agreement(s) (as included in the Schedules A and/or B) will be utilized and traditional craft jurisdictional work assignments will be made accordingly, as determined by the Contractor. Each Contractor shall hold a pre-job conference with the Unions and a standard format shall be developed for this meeting.

(b) Any dispute as to the applicable source, between this Agreement and the Schedules A and/or B, for determining hours and working conditions of employees on the Project shall be resolved by (same as Article II, Section 9). It is understood that this Agreement, together with the referenced Schedules A and/or B, constitutes a self-contained, stand alone, Agreement and that by virtue of having become bound to this Agreement, the Contractor will not be obligated to sign any other Local, Area or National Agreement.

Section 4. This Agreement shall only be binding on the signatory parties hereto and shall not apply to the parents, affiliates, subsidiaries, or other ventures of any such party.

Section 5. This Agreement shall be limited to work historically recognized as construction work, including, specifically, the site preparation and related demolition work necessary to prepare the site for construction. Nothing contained herein shall be construed to prohibit, restrict, or interfere with the performance of any other operation, work or function which may occur in or around the Project site or be associated with the development of the Project, or with the ongoing operations of the Massachusetts Department of Public Works.

Section 6. Items specifically excluded from the scope of this Agreement include, but are not limited to the following:

A. Work of non-manual employees, including but not limited to, superintendents, supervisor, staff engineers, inspectors, quality control personnel, quality assurance personnel, timekeepers, mail carriers, clerks, office workers, including messengers, guards, emergency medical and first aid technicians, and other professional, engineering, administrative, supervisory and management employees.

B. Equipment and machinery owned or controlled and operated by the MDPW.

C. All off-site handling of materials, equipment or machinery and all deliveries to and from the Project site.

D. All employees of the MDPW, and all employees of Bechtel/Parsons Brinckerhoff or the Contractor not performing manual labor.

E. Any work performed on or near, or leading to or into, the Project site by state, county, city or governmental bodies, or by public utilities; and/or by the MDPW (for work which is not part of the Project).

F. Off-site maintenance on leased equipment and on-site supervision of such work.

G. Off-site warranty functions and warranty work and on-site supervision of such work.

H. Exploratory geophysical testing and boring both on-land and offshore, except where expressly covered by a current Collective Bargaining Agreement which forms the basis for the Schedules A and/or B.

I. Laboratory or specialty testing or inspections not ordinarily done by the crafts.

J. Work performed directly by the railroads.

Section 7. None of the provisions of this Agreement shall apply to the Massachusetts Department of Public Works and nothing contained herein shall be construed to prohibit or restrict the MDPW or its employees from performing work not covered by this Agreement on the Project site. As areas and systems of the Project are inspected and construction tested by Bechtel/Parsons Brinckerhoff or Contractor and accepted by the MDPW, the Agreement shall not have further force or effect on such items or areas, except when Bechtel/Parsons Brinckerhoff or Contractor are directed by the MDPW to engage in additions, repairs, modifications, checkout, and/or warranty functions required by their contract(s) with the MDPW.

Section 8. It is understood that the MDPW, at its sole option, may terminate, delay and/or suspend any or all portions of the Project at any time.

<u>Section 9.</u> To the extent that there may be changes, and that these changes may be or appear to be, in conflict with this Agreement, the parties will use their best efforts to resolve these issues, to the extent necessary, but should they be unable to resolve the matter, the dispute or differences shall be referred to ________________________, who shall hear and resolve the matter in a manner consistent with the terms of this Agreement and to the extent possible in the best interest of all parties involved including specifically the MDPW, the citizens of Massachusetts, who the MDPW serves, and the Union and the employees it represents on the Project.

<u>Section 10.</u> It is understood that the liability of any Contractor and the liability of the separate Unions under this Agreement shall be several and not joint. The Unions agree that this Agreement does not have the effect of creating any joint employment status between or among the MDPW, Bechtel/Parsons Brinckerhoff and/or any Contractor.

## ARTICLE III

## UNION RECOGNITION AND EMPLOYMENT

Section 1: The Contractor recognizes the Union as the sole and exclusive bargaining representative of all craft employees working on facilities within the scope of this Agreement.

Section 2: Applicants for various classifications covered by the Agreement required by the Contractor on the Project shall be referred to the Contractor by the Local Union. The Contractor shall have the right to determine the competency of all employees, the right to determine the number of employees required and shall have the sole responsibility for selecting the employees to be laid-off except where otherwise provided for in Schedules A or B and consistent with Article IV, Section 3 below. The Contractor shall also have the right to reject any applicant referred by the Local Union, subject to the show-up payments required in the applicable Schedules A and/or B.

Section 3: For a Local Union now having a job referral system in its Local Collective Bargaining Agreement, for the purpose of initial employment only, the Contractor agrees to include such system in the appropriate Schedules A and/or B and it shall be used exclusively by the Contractor. Such job referral system must be operated in a non-discriminatory manner and in full compliance with federal, state and local laws and regulations which require equal employment opportunities and non-discrimination, and referrals shall not be affected in any way by the rules, regulations, by-laws, constitutional provisions or any other aspects or obligations of union membership, policies or requirements and shall be subject to such other conditions as established in this Article.

Section 4: All employees covered by this Agreement shall be subject to the union security provisions contained in the applicable Schedules A and/or B.

Section 5: In the event that any Union is unable to fill any requisition for employees within a forty-eight (48) hour period after such requisition is made by the Contractor (Saturdays, Sundays and Holidays excepted), the Contractor may employ applicants from any other available source.

Section 6: In the event that the Local Union does not have a job referral system as set forth in Section 3 of this Article, the Contractor shall give the Local Union first preference to refer applicants, subject to the provisions of Section 5. The Contractor shall notify the Union of employees hired by any source other than referral by the Union.

Section 7: The Local Union shall not knowingly refer to a Contractor under this Agreement employees currently employed by another Contractor working under this Agreement.

Section 8: The Local Unions will exert their utmost efforts to recruit sufficient numbers of skilled craftsmen to fulfill the manpower requirements of the Contractor.

Section 9: The selection of craft foremen and/or general foremen and the number of foremen required shall be entirely the responsibility of the Contractor. It is understood that the procedure for selection of such foremen and/or general foremen may be affected by specific provisions of applicable Schedules A and/or B; and, further, that the Contractor shall give primary consideration to qualified individuals within the jurisdiction of the Local Union (limited, where required by existing local Collective Bargaining Agreements, to those passing a required test). After giving such consideration, the Contractor may select such individuals from other geographic jurisdictions. All foremen shall take orders exclusively from the designated Contractor representatives. Craft foremen shall be designated as working foremen at the request of the Contractor, except when an existing local Collective Bargaining Agreement prohibits a foreman from working when the craftsmen he is leading exceed a specified number.

## ARTICLE IV

## UNION REPRESENTATION

Section 1: Authorized representatives of the Union shall have access to the Project, provided they do not interfere with the work of employees and further provided that such representatives fully comply with the posted visitor and security and safety rules of the Project.

Section 2: Stewards

(a) Each signatory Local Union shall have the right to designate a working journeyman as a steward, and shall notify the Contractor in writing of the identity of the designated steward prior to the assumption of his duties as steward. Such designated steward shall not exercise any supervisory functions. There will be no non-working stewards. Stewards will receive the regular rate of pay of their respective crafts.

(b) In addition to his work as an employee, the steward shall have the right to receive, but not solicit, complaints or grievances and to discuss and assist in the adjustment of the same with the employee's appropriate supervisor. Each steward shall be concerned with the employees of the steward's contractor and, if applicable, subcontractors, and not with the employees of any other contractor. The Contractor will not discriminate against the steward in the proper performance of his Union duties.

(c) The stewards shall not have the right to determine when overtime shall be worked or who shall work overtime, except on the basis of a Schedules A and/or B which contains a procedure for establishing equitable distribution of overtime.

Section 3: The Contractor agrees to notify the appropriate Union twenty-four (24) hours prior to the layoff of a steward, except in the case of discipline or discharge for just cause. If a steward is protected against such layoff by the provisions of any Schedules A and/or B such provisions shall be recognized to the extent that the steward possesses the necessary qualifications to perform the work remaining. In any case in which a steward is discharged or disciplined for just cause, the appropriate Union shall be notified immediately by the Contractor.

<u>Section 4:</u> On work where the MDPW personnel may be working in close proximity of the construction activities, the Union agrees that the Union representatives, stewards and individual workers will not interfere with the MDPW's personnel or with the work which is being performed by the MDPW personnel.

## ARTICLE V

## MANAGEMENT'S RIGHTS

Section 1: The Contractor retains full and exclusive authority for the management of its operation. Except as expressly limited by other provisions of this Agreement, the Contractor retains the right to direct the workforce, including the hiring, promotion, transfer, lay-off, discipline or discharge for just cause of its employees; the selection of foremen; the assignment and schedule of work; the promulgation of reasonable work rules; and, the requirement of overtime work, the determination of when it shall be worked, and the number and identity of employees engaged for such work. No rules, customs, or practices which limit or restrict productivity, efficiency of the individual and/or joint working efforts of employees shall be permitted or observed. The Contractor may utilize any methods or techniques of construction.

Section 2: Except as otherwise expressly stated in this Agreement, there shall be no limitation or restriction upon the Contractor's choice of materials or design, nor, regardless of source or location, upon the full use and installation of equipment, machinery, package units, pre-cast, pre-fabricated, pre-finished, or pre-assembled materials, tools, or other labor-saving devices. The Contractor may without restriction install or otherwise use materials, supplies or equipment regardless of their source according to Schedules A and/or B or as customarily performed in this area. The on-site installation or application of such items shall be performed by the craft having jurisdiction over such work; provided, however, it is recognized that other personnel having special talents or qualifications may participate in the installation, check-off or testing of specialized or unusual equipment or facilities.

Section 3: Except as otherwise expressly stated in this Agreement, it is recognized that the use of new technology, equipment, machinery, tools and/or labor-saving devices and methods of performing work will be initiated by the Contractor from time to time during the Project. The Union agrees that it will not in any way restrict the implementation of such new devices or work methods. If there is any disagreement between the Contractor and the Union concerning the manner or implementation of such device or method of work, the implementation shall proceed as directed by the Contractor, and the Union shall have the right to grieve and/or arbitrate the dispute as set forth in Article VII of this Agreement.

ARTICLE VI

WORK STOPPAGES AND LOCKOUTS

Section 1: There shall be no strikes, picketing, work stoppages, slowdowns or other disruptive activity for any reason by the Union or employees against any Contractor covered under this Agreement, and there shall be no lockout by the Contractor. Failure of any Union or employee to cross any picket line established by any union, signatory or non-signatory, or any other organization, at or in proximity to the Project site is a violation of this Article.

Section 2: The Contractor may discharge any employee violating Section 1, above, and any such employee will not be eligible for referral under this Agreement for a period of ninety (90) working days from the date of his discharge. The Contractor and the Union shall take all steps necessary to obtain compliance with this Article and neither shall be held liable for conduct for which it is not responsible.

Section 3: If the Contractor contends that any Union has violated this Article, it will telegraph the International President(s) of the Local Union(s) involved advising him of the fact, with copies of such telegram to the President of the Local Union(s) involved, the Building Trades Council and the Department. The International President or Presidents will immediately instruct, order and use the best efforts of his office to cause the Local Union or Unions to cease any violation of this Article. An International Union complying with this obligation shall not be liable for unauthorized acts of its Local Union.

Section 4: Any party, including Bechtel/Parsons Brinckerhoff, may institute the following procedure, in lieu of or in addition to any other action at law or equity, when a breach of Section 1, above, is alleged:

a. A party invoking this procedure shall notify ________________ whom the parties agree shall be the permanent arbitrator under this procedure. In the event that the permanent arbitrator is unavailable at any time, he shall appoint his alternate. Notice to the arbitrator shall be by the most expeditious

means available, with notices by telegram to the party alleged to be in violation and to the Department and the Council if it is a Union alleged to be in violation.

b. Upon receipt of said notice, the arbitrator named above or his alternate shall sit and hold a hearing within twenty-four (24) hours if it is contended that the violation still exists, but not before twenty-four (24) hours after the telegraph notice to the International President(s) required by Section 3, above.

c. The arbitrator shall notify the parties by telegram of the place and time he has chosen for this hearing. Said hearing shall be completed in one session, which, with appropriate recesses at the arbitrator's discretion, shall not exceed 24 hours unless otherwise agreed upon by all parties. A failure of any party or parties to attend said hearing shall not delay the hearing of evidence or the issuance of any award by the arbitrator.

d. The sole issue at the hearing shall be whether or not a violation of Section 1, above, has in fact occurred, and the arbitrator shall have no authority to consider any matter in justification, explanation or mitigation of such violation or to award damages, which issue is reserved for court proceedings, if any. The Award shall be issued in writing within three (3) hours after the close of the hearing, and may be issued without an Opinion. If any party desires an Opinion, one shall be issued within fifteen (15) days, but its issuance shall not delay compliance with, or enforcement of, the Award. The arbitrator may order cessation of the violation of this Article and other appropriate relief, and such Award shall be served on all parties by hand or registered mail upon issuance.

e. Such Award may be enforced by any Court of competent jurisdiction upon the filing of this Agreement and all other relevant documents referred to hereinabove in the following manner. Telegraphic notice of the filing of such enforcement proceedings shall be given to the other party. In the proceeding to obtain a temporary order enforcing the arbitrator's Award as issued under Section 4(d) of this Article, all parties waive the right to a hearing and agree that such proceedings may be _ex parte_. Such Agreement does not waive any party's right to participate in a hearing for a final order of

enforcement. The Court's order or orders enforcing the arbitrator's award shall be served on all parties by hand or by delivery to their last known address or by registered mail.

f. Any rights created by statute or law governing arbitration proceedings inconsistent with the above procedure or which interfere with compliance hereto are hereby waived by the parties to whom they accrue.

g. The fees and expenses of the arbitrator shall be equally divided between the moving party or parties and the party or parties respondent.

<u>Section 5:</u> Procedures contained in Article VII shall not be applicable to any alleged violation of this Article, with the single exception that any employee discharged for violation of Section 1, above, may resort to the procedures of Article VII to determine only if he was, in fact, engaged in that violation.

ARTICLE VII

LABOR MANAGEMENT COMMITTEE

Section 1: The purpose of the Central Artery Labor-Management Committee is three fold: 1) promote harmonious relations among the parties to the agreement; 2) enhance safety awareness, cost effectiveness and productivity of work operation; and 3) protect the public interests in the Project.

Section 2: The Committee shall have no authority to alter or amend the Agreement. It shall meet on a regular basis and address issues of mutual concern as so expressed in Section 1.

Section 3: The Committee shall consist of a representative from each signature party to the Agreement and shall be jointly chaired by the Secretary of the Building and Construction Trades Council of the Metropolitan District and Bechtel/Parsons Brinckerhoff's Labor Coordinator.

ARTICLE VIII

DISPUTES AND GRIEVANCES

Section 1: This Agreement is intended to provide close cooperation between management and labor. Bechtel/Parsons Brinckerhoff and The Building and Construction Trades Department and The Building and Construction Trades Council of the Metropolitan District shall each assign a representative to this Project for the purpose of assisting the International and Local Unions, together with the Contractor, to complete the construction of the Project economically, efficiently, continuously and without interruption, delays or work stoppages.

Section 2: The Contractor, Unions, and employees collectively and individually, realize the importance to all parties to maintain continuous and uninterrupted performance of the work of the Project, and agree to resolve disputes in accordance with the arbitration provisions set forth in this Article.

Section 3: Any question arising out of and during the term of this Agreement involving its interpretation and application (other than trade jurisdictional disputes or alleged violations of Article VI, Section 1) shall be considered a grievance and subject to resolution under the following procedures:

Step 1 (a): When any employee subject to the provisions of this Agreement feels he is aggrieved by a violation of this Agreement, he shall, through his Local Union business representative or job steward, within five (5) working days after the occurrence of the Violation, give notice to the work site representative of the involved Contractor stating the provision(s) alleged to have been violated. The business representative of the Local Union or the job steward and the work site representative of the involved Contractor shall meet and endeavor to adjust the matter within three (3) working days after timely notice has been given. If they fail to resolve the matter within the prescribed period, the grieving party, may, within forty-eight (48) hours thereafter, pursue Step 2 of the grievance procedure provided the grievance is reduced to writing, setting forth the relevant information concerning the alleged grievance, including a short description thereof, the date on which the grievance occurred, and the provision(s)

of the Agreement alleged to have been violated. Grievances and disputes settled at Step 1 shall be non-precedential except as to the parties directly involved unless endorsed by Bechtel/Parsons Brinckerhoff within five (5) days after resolution has been reached and the terms of the resolution are set forth in writing to Bechtel/Parsons Brinckerhoff.

(b) Should the Local Union(s) or Project Manager or any other Contractor have a dispute with other party and, if after conferring, a settlement is not reached within three (3) working days, the dispute shall be reduced to writing and proceed to Step 2 in the same manner as outlined herein for the adjustment of an employee complaint.

Step 2: The Business Manager or his designee of the involved Local Union, together with the International Union representative of the Union, the site representative of the involved Contractor, and the labor relations representative of Bechtel/Parsons Brinckerhoff shall meet within seven (7) working days of the referral of the dispute to this second step to arrive at a satisfactory settlement thereof. If the parties fail to reach an agreement, the dispute may be appealed in writing in accordance with the provisions of Step 3 within fourteen (14) calendar days after the initial meeting at Step 2.

Step 3 (a): If the grievance shall have been submitted but not adjusted under Step 2, either party may request, in writing, within fourteen (14) calendar days after the initial Step 2 meeting, that the grievance be submitted to an arbitrator selected from the panel pre-selected by the parties to this Agreement, or if the membership of a panel has yet to be agreed upon, by mutual agreement of the parties, but if they are unable to do so within fourteen (14) days after referral to them for arbitration, they shall request the American Arbitration Association to provide them with a list of arbitrators from which the arbitrator shall be selected. The rules of the American Arbitration Association shall govern the conduct of the arbitration hearing. The decision of the arbitrator

shall be final and binding on all parties and the fee and expenses of such arbitrations shall be borne equally by the involved Contractor and the involved Union(s).

(b): Failure of the grieving party to adhere to the time limits established herein shall render the grievance null and void. The time limits established herein may be extended only by written consent of the parties involved at the particular step where the extension is agreed upon. The arbitrator shall have the authority to make decisions only on issues presented to him and he shall not have the authority to change, amend, add to or detract from any of the provisions of this Agreement.

Section 4: No adjustment or decision may provide retroactivity exceeding sixty (60) days prior to the date of the filing of a written grievance.

Section 5: Bechtel/Parsons Brinckerhoff shall be notified by the involved Contractor of all actions at Steps 2 and 3 and shall, upon its request, be permitted to participate in full in all proceedings at these steps.